1

2

3                                                          O

4

5

6

7                  UNITED STATES DISTRICT COURT

8                CENTRAL DISTRICT OF CALIFORNIA

9

10  ALEXANDER PEREZ          )   Case No.
    ALVARADO; ELMER PEREZ    )   SACV 12-0328 JGB (ANx)
11  ALVARADO,                )
                             )
12                           )   **ORDER DENYING DEFENDANTS'**
                  Plaintiffs, )  **MOTION FOR PARTIAL SUMMARY**
13                           )   **JUDGMENT**
         v.                  )
14                           )
    THE CITY OF SANTA ANA;   )
15  SANTA ANA POLICE         )
    DEPARTMENT; CORPORAL M.  )
16  MORENO; OFFICER T. LE;   )
    OFFICER B. SONTAG;       )
17  OFFICER D. PREWETT,      )

18                Defendants.
19  _____

20

21

22       Before the Court is a Motion for Partial Summary

23  Judgment filed by Defendants.  ("Motion," Doc. No. 44.)

24  After considering all papers submitted in support of and

25  in opposition to the Motion and the arguments presented

26  at the May 20, 2013 hearing, the Court DENIES Defendants'

27  Motion for Partial Summary Judgment.

28

# I.   BACKGROUND

**A.   Procedural Background**

Plaintiffs Alexander Perez Alvarado ("APA") and Elmer Perez Alvarado ("EPA") are the surviving minor sons of Decedent Elmer Alexander Perez ("Perez") represented by their guardian ad litem Diana Alvarado[1].  Plaintiffs filed their Complaint against Defendants The City of Santa Ana ("Santa Ana"), Santa Ana Police Department ("SAPD"), Corporal M. Moreno ("Moreno"), Officer T. Lee ("Lee")[2], Officer B. Sontag ("Sontag"), and Officer D. Prewett ("Prewett") (collectively, "Defendants") on March 6, 2012.  ("Compl.," Doc. No. 3.)  Defendants answered on May 21, 2012.  (Doc. No. 16.)

Defendants filed a Motion for Partial Summary Judgment on April 1, 2013.  ("Motion," Doc. No. 44.)  In support of their Motion, they included: Statement of Uncontroverted Facts and Conclusions of Law ("SUF"); a Declaration of Steven Wysocky ("Wysocky Decl.") attaching exhibits A through E and G through N, and a Declaration of Corporal Anthony Bertagna ("Bertagna Decl.") attaching exhibit F-1, a SAPD 9-1-1 dispatch log from December 16, 2010 from 5:07am to 6:26am ("Dispatch Log"), and exhibit

---

[1] The parties refer to Ms. Alvarado as "Diana" or "Diane."  For consistency, the Court will identify Ms. Alvarado as "Diana."

[2] Incorrectly spelled as "Le" in certain documents.

2

1   F-2, a digital recording of all radio broadcasts for that
2   time period ("SAPD Radio Broadcast").[3]

3       Plaintiffs opposed the Motion on April 15, 2013.
4   ("Opp'n," Doc. No. 50.)[4]  Plaintiffs attached a Statement
5   of Genuine Disputes of Material Fact ("SGI") and 24
6   exhibits.

7       On April 22, 2013, Defendants replied ("Reply," Doc.
8   No. 53) and also filed objections to the evidence offered
9   in Plaintiffs' opposition ("Obj.," Doc. No. 52.).

10

11  **B.   The Complaint**

12

13      Plaintiffs APA and EPA bring their claims through
14  their mother, Diana Alvarado ("Alvarado"), as surviving
15  sons of Decedent Perez, their father.  (Compl. ¶¶ 1-2.)
16  The Complaint alleges that on December 16, 2010 APA was
17  residing with his parents, Alvarado and Perez, at their
18  home in Santa Ana.  (Compl. ¶ 11.)  At the time, Alvarado
19  was pregnant with her second son with Perez who was born
20  three months after the incident.  (Id.)  The Complaint
21  contends that Santa Ana Police Officers shot an unarmed

22

23  _____

24      [3] Defendants also lodged a copy of a disc with the
    SAPD Radio Broadcast.  (Doc. No. 48.)

25
26      [4] Plaintiffs' Opposition was filed seven days late
    without explanation or excuse.  On April 23, 2013, the
    Court issued an Order to Show Cause why Plaintiffs' late
27  filing should not be rejected.  (Doc. No. 54.)
    Plaintiffs filed a response on April 25, 2013 (Doc. No.
28  55), and the Court discharged its Order (Doc. No. 56).

1    Perez multiple times resulting in his death.  (Compl. ¶
2    12.)

3       Based on these facts, the Complaint stated four
4    claims for relief, each of which included several
5    subparts.  (Compl. at 8-24.)  Since that time, Plaintiffs
6    have stipulated to dismiss several causes of action,
7    namely their claims for conspiracy in violation of 42
8    U.S.C. §§ 1985 and 1986, the entirety of the second claim
9    for a Monell violation under 42 U.S.C § 1983, and their
10   state law claims for negligent hiring, training, and
11   retention.  (Doc. No. 43.)  In response to Defendants'
12   Motion, Plaintiffs also conceded that they have no
13   evidence to support the entirety of their fourth claim
14   under California Civil Code §§ 51, 51.7, 52 and 52.1.
15   (Opp'n at 12.)  Plaintiffs agreed to withdraw their
16   fourth claim for relief.  (Id.)  The Court therefore
17   DISMISSES Plaintiffs' fourth claim for relief pursuant to
18   Cal. Civ. Code §§ 51, 51.7, 52, and 52.1.

19      Two claims for relief remain.  Plaintiffs' first
20   claim is for violation of 42 U.S.C. § 1983 for Fourth and
21   Fourteenth Amendment violations against the individual
22   officer Defendants.  (Compl. ¶¶ 25-43.)  The third claim
23   for relief includes state law wrongful death and survival
24   claims under Cal. Code Civ. P. §§ 377.60 and 377.30 based
25   on assault and battery and negligence.  (Compl. ¶¶ 50-
26   61.)

27

28

                                    4

## C.   Motion for Partial Summary Judgment

Defendants seek summary judgment on two portions of Plaintiffs' remaining claims.  Defendants move for judgment as a matter of law on (1) Plaintiffs' 42 U.S.C. § 1983 claim under the Fourteenth Amendment and (2) the preshooting negligence aspect of Plaintiffs' negligence claim under California law.  (Motion at 5.)[5]

## II.   LEGAL STANDARD[6]

A court shall grant a motion for summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)

---

[5] Defendants also sought summary judgment on Plaintiffs' fourth claim for relief under several sections of the California Civil Code.  As discussed above, Plaintiffs voluntarily withdrew this claim.  The Court therefore does not address Defendants' arguments related to Plaintiffs' fourth claim.

[6] Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

(citing Anderson, 477 U.S. at 256-57); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Because summary judgment is a "drastic device" that cuts off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any genuine issue of material fact.  See Avalos v. Baca, No. 05-CV-07602-DDP, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) (quoting Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999)).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  Celotex, 477 U.S. at 325. Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case.  Id.; Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007).  "[A] summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)).

1    The burden then shifts to the non-moving party to
2  show that there is a genuine issue of material fact that
3  must be resolved at trial.  Fed. R. Civ. P. 56(c);
4  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The
5  non-moving party must make an affirmative showing on all
6  matters placed in issue by the motion as to which it has
7  the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;
8  <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W.
9  Schwarzer, A. Wallace Tashima & James M. Wagstaffe,
10 <u>Federal Civil Procedure Before Trial</u> § 14:144.  A genuine
11 issue of material fact will exist "if the evidence is
12 such that a reasonable jury could return a verdict for
13 the non-moving party."  <u>Anderson</u>, 477 U.S. at 248.

14    In ruling on a motion for summary judgment, a court
15 construes the evidence in the light most favorable to the
16 non-moving party.  <u>Scott v. Harris</u>, 550 U.S. 372, 378,
17 380 (2007); <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th
18 Cir. 1991); <u>T.W. Elec. Serv. Inc. v. Pac. Elec.</u>
19 <u>Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).

20    If the Court is unable to render summary judgment
21 upon an entire case, it shall, if practicable, grant
22 summary adjudication for any issues as to which, standing
23 alone, summary judgment would be appropriate.  <u>See</u> Fed.
24 R. Civ. P. 56(a); <u>California v. Campbell</u>, 138 F.3d 772,
25 780-81 (9th Cir. 1998).  Thus, summary adjudication is a
26 mechanism through which the Court deems certain issues
27 established before trial.  <u>Lies v. Farrell Lines, Inc.</u>,
28

641 F.2d 765, 769 n. 3 (9th Cir. 1981) (internal quotation omitted).  The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a); <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

## III. DISCUSSION

### A.  Evidentiary Objections

Defendants object to several pieces of evidence offered by Plaintiffs.  Many of Defendants' objections are on grounds of relevance under Federal Rules of Evidence 401 and 402.  (<u>See, e.g.</u>, Obj. ¶¶ 18, 19, 22.) "Objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. <u>Burch v. Regents of Univ. of California</u>, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); <u>see</u> <u>Anderson</u>, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").  Thus, the Court does not rule on Defendants' relevance objections.

Defendants also object to the Deposition of Officer Adam Aloyian ("Aloyian Depo.," Pl. Exh. 19) because it lacks authentication pursuant to Federal Rules of

8

1   Evidence 901 and 902.  (Obj. ¶ 20.)  The Court finds that

2   Aloyian's deposition is not properly authenticated as the

3   copy provided to the Court was not signed by the

4   deponent, a notary public, or the court reporter.  <u>See</u>

5   <u>Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764, 774 (9th Cir.

6   2002); <u>Pavone v. Citicorp Credit Servs., Inc.</u>, 60 F.

7   Supp. 2d 1040, 1045 (S.D. Cal.1997) (excluding a

8   deposition for failure to submit a signed certification

9   from the reporter).  The Court therefore SUSTAINS

10  Defendants' objection to the Aloyian deposition, and the

11  Court does not consider it here.[7]

12      Finally, Defendants object to the expert report

13  authored by Plaintiffs' police practices expert, Roger

14  Clark.  ("Clark Report," Pl. Exh. 22.)  The Clark Report

15  is inadmissible for numerous reasons, chief among them

16  being that the Report is unsworn and fails to lay an

17  adequate foundation for an expert opinion under Federal

18  Rule of Evidence 702.  It "is well established, that an

19

20  ───────────────

21      [7] Plaintiffs failed to properly authenticate all of
    the deposition excerpts submitted in support of its
22  opposition.  Plaintiffs failed to include reporter's
    certifications or an affidavit from counsel laying the
    proper foundation for the depositions.  <u>See Orr</u>, 285 F.3d
23  at 774 ("A deposition or an extract therefrom is
    authenticated in a motion for summary judgment when it
24  identifies the names of the deponent and the action and
    includes the reporter's certification that the deposition
25  is a true record of the testimony of the deponent.").
    However, "when a document has been authenticated by a
26  party, the requirement of authenticity is satisfied as to
    that document with regards to all parties."  <u>Id.</u> at 776.
27  All of the depositions, aside from Aloyian's, were
    authenticated by Defendants, therefore their authenticity
28  is established for Plaintiffs as well.

1  unsworn expert report is inadmissible." Shuffle Master,
2  Inc. v. MP Games LLC, 553 F. Supp. 2d 1202, 1210 (D. Nev.
3  2008).   The provided excerpts of the Clark Report do not
4  include Clark's signature let alone any attestation that
5  the conclusions in the Report are true and correct.   In
6  addition, the Report provides no foundational information
7  about Clark's training or length of experience which gave
8  rise to his ability to come to a stated conclusion.  See
9  Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada
10 Inc., 371 F. App'x 719, 720 (9th Cir. 2010).  Without any
11 underlying support for his conclusions, Clark's Report is
12 "unsupported speculation" and must be excluded.  See
13 Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590
14 (1993).  The Court SUSTAINS Defendants' objections to the
15 Clark Report.

16

17 **B.   Undisputed Facts**

18

19      Given the limited scope of the instant Motion, the
20 Court primarily addresses undisputed and disputed facts
21 that are relevant to Defendants' Motion.  However, facts
22 that are primarily relevant to Plaintiffs' wrongful death
23 and Fourth Amendment excessive force claims are provided
24 as necessary to give context and background to the claims
25 at issue.
26      Unless otherwise noted, the following material facts
27 are sufficiently supported by admissible evidence and are
28

uncontroverted.  They are "admitted to exist without
controversy" for purposes of the Motion.  L.R. 56-3
(facts not "controverted by declaration or other written
evidence" are assumed to exist without controversy); Fed.
R. Civ. P. 56(e)(2) (stating that where a party fails to
address another party's assertion of fact properly, the
court may "consider the fact undisputed for purposes of
the motion").

**1.  9-1-1 Call**

     In the early morning hours of December 16, 2010,
Elmer Alexander Perez ("Perez") was in his condominium in
Santa Ana, California.  (SUF ¶ 8; SGI ¶ 8.)  Also present
were Perez's mother, Maria Calderon Herrera ("Mrs.
Herrera"), his step-father, Francisco Herrera ("Mr.
Herrera"), his sister, Kimberly Perez, his live-in
girlfriend, Diana Alvarado ("Alvarado"), and his 2-year-
old son, Plaintiff APA.  (SUF ¶¶ 2-6; SGI ¶¶ 2-6.)  At
the time, Alvarado was pregnant with Perez's second son,
Plaintiff EPA.  (SUF ¶ 7; SGI ¶ 7.)
     That morning, Mrs. Herrera awoke between 4:30am and
5:00am and began getting ready for work.  (SUF ¶ 9; SGI ¶
9.)  When she exited her bedroom, she saw Perez, her son,
holding a gun.  (SUF ¶ 10; SGI ¶ 10.)  Alvarado told Mrs.
Herrera that the gun was not real.  (SUF ¶ 11; SGI ¶ 11.)
Mrs. Herrera noticed that Perez was acting strangely,

speaking fast, and acting paranoid, and she believed he
was under the influence of drugs.  (SUF ¶ 12; SGI ¶ 12.)
Mrs. Herrera asked her husband to call the police to get
help for her son.  (SUF ¶ 13; SGI ¶ 13.)  Mr. Herrera
called 9-1-1 just after 5:00am and told the dispatcher
that Perez was on drugs and threatening everyone with a
toy gun.  (SUF ¶ 15; SGI ¶ 15.)

At 5:11am, the dispatcher broadcast a request for
officers to respond to the condominium.  (SUF ¶ 18; SGI ¶
18.)  Dispatch notified officers that Perez was under the
influence of an unknown type of narcotics and was engaged
in a domestic dispute with his 7-month pregnant wife and
also possibly under the influence of alcohol.  (SUF ¶ 19;
SGI ¶ 19.)  The broadcast also notified officers that the
caller stated he is "certain" the subject has a toy gun,
not a real gun.  (Dispatch Log at 1.)  Multiple officers
responded to the call, including Moreno, Prewett, and Lee
who were first to arrive, followed by Sontag.  (SUF ¶ 20;
SGI ¶ 20.)

**C.   Disputed Facts**

Beginning with the officers' first contact with the
family, the parties recounting of the facts differs in
many respects.  All disputed facts are specifically
noted.

## 1. First Contact with Officers

Mr. Herrera met Officers Moreno and Prewett outside the home at approximately 5:20am.  (SUF ¶ 21; SGI ¶ 21.) The content of the conversation between the officers and Mr. Herrera is disputed.  Mr. Herrera states that he told Moreno in Spanish that Perez had a toy gun and when asked whether he was sure, Mr. Herrera repeated that "of course it's a toy."  (Deposition of Francisco Herrera ("Mr. Herrera Depo.") 34:10-22, Wysocky Decl., Exh. D.)  Moreno recounts the same conversation, but also adds that he asked Mr. Herrera how he knew it was a toy and whether he had seen the gun himself.  (Deposition of Corporal M. Moreno ("Moreno Depo.") 39:3-11, Wysocky Decl., Exh. G.) According to Moreno, Mr. Herrera replied that he had not seen the gun, but his wife had seen it and relayed that it was a toy.  (Moreno Depo. 39:12-25.)  He also admitted that neither he nor his wife had ever owned or fired a real gun.  (Id.)  Finally, when asked again how he knows it is a real gun, Mr. Herrera replied "I don't know then."  (Id.)  It is undisputed that Moreno relayed this information onto Prewett who reported it to dispatch. (SUF ¶ 24; SGI ¶ 24.)

The following facts are uncontroverted.  Moreno, Prewett, Lee and Mr. Herrera approached the residence, and the officers told Kimberly Perez and Mrs. Herrera to exit the home.  (SUF ¶¶ 25-26; SGI ¶¶ 25-26.)  On her way

1  out, Kimberly Perez told the officers that her brother
2  was on drugs and acting weird, that he was not harmful
3  and he had a toy gun in his hand, but to be careful
4  because her nephew and pregnant sister-in-law were
5  upstairs.  (Deposition of Kimberly Perez ("K. Perez
6  Depo.") 36:8-15, Pl. Exh. 7.)  Mrs. Herrera also states
7  that she told the officers not to harm her son because
8  the weapon is not real.  (Deposition of Maria Antonia
9  Calderon Herrera ("Mrs. Herrera Depo.") 44:17-21, Pl.
10 Exh. 9.)  Mr. Herrera then showed an unidentified officer
11 to the back of the condominium to show him the window of
12 the room where Perez was located.  (SUF ¶ 27; SGI ¶ 27.)
13
14     **2.  At The Doorway**
15
16     Meanwhile, the rest of the officers were at the front
17 door of the residence.  There is disagreement over what
18 was said or heard by the officers and Perez during the
19 approximately 10 minutes the officers remained in the
20 doorway.  (SUF ¶ 32; SGI ¶ 32.)  However, all witnesses
21 agree that during this time the officers gave Perez the
22 command to come downstairs and asked him if he would
23 allow his wife and child to come down.  (SUF ¶ 30; SGI ¶
24 30.)
25     In Plaintiffs' version of the facts, Mr. Herrera did
26 not hear any yelling or screaming from inside the house,
27 and he only heard the officers telling Perez to "come
28

14

down." (Mr. Herrera Depo. 39:9-23; 66:12-19.) Ms. Alvarado also states that there was no screaming, crying, commotion, or noise coming from inside during this time, and she only heard the police tell Pezrez to "come down" one time. (Deposition of Diana Alavarado ("Alvarado Depo.") 50:4-14, 54:5-7, 81:22-25, 82:11-13, Pl. Exh. 2.) Ms. Alvarado provides conflicting testimony regarding whether Perez verbally responded to the officers' commands to come down. (Compare Alvarado Depo. 54:5-13, 53:17-19 with 52:9-12.)

The officers provided testimony contrary to the family members regarding the events during this time period. Corporal Moreno testified that when they stood at the threshold of the house he heard an argument going on with raised voices and a female crying. (Moreno Depo. 71:17-72-15.) Officer Prewett similarly heard a woman crying and a man shouting as well as objects being tossed around. (Deposition of David Prewett ("Prewett Depo.") 40:3-8, Wysocky Decl., Exh H.) Prewett also recalls Moreno giving Perez a command to come downstairs, and Perez shouting unintelligible responses. (Prewett Depo. 40:14-42:4.) Prewett also states that he told Perez multiple times that it was the police and they needed him to come downstairs with his hands up. (Prewett Depo. 42:9-11.) Prewett testifies that he heard Perez make comments such as "show me your face," "I am going to have to handle this with my knife," and "I do not have any

kids up here."  (Prewett Depo. 42:22-43:13.)  At that
point, Prewett asked Perez to allow his wife and child to
come down.  (Prewett Depo. 44:2-5.)  A neighbor, Rian
Kennedy, also testified that he heard officers
repetitively asking Perez to come down and also telling
him that they wanted to make sure his wife and kid were
okay.  (Deposition of Rian Kennedy ("Kennedy Depo.")
19:1-21, Wysocky Decl., Exh. I.)  Both parties agree that
Perez did not come down the stairs, nor did he allow
Alvarado or APA to leave.  (SUF ¶ 34; SGI ¶ 34.)

It is undisputed that during the negotiation with
Perez, other officers arrived on the scene, including
Aloyian, Hernandez, Romero, and Sontag.  (SUF ¶ 33; SGI ¶
33.)  When Prewett relayed to the others that he heard
Perez's comment about a knife, Moreno requested for
"less-lethal munitions to be brought to the scene."
(Moreno Depo. 77:3-12.)  He also considered using a taser
and conceded it would be effective if Perez had a knife.
(Moreno Depo. 77:13-80:23.)

### 3.  Decision to Enter

At 5:36am, Prewett reported to dispatch that it
"sounds like subj[ect] 242'ing [assaulting] relatives
ins[i]d[e] res[i]d[ence], also made threats on his own
life."  (Dispatch Log at 5:36:24.)  Prewett remembers
that at this time Perez became very loud, a child

1   screamed, and he heard several objects thrown around.
2   (Prewett Depo. 46:23-47:2.)  At 5:37am, Moreno reported
3   to dispatch that the "susp[ect] [was] becoming more
4   violent" and the officers were "making entry." (Dispatch
5   Log at 5:37:08.)  Moreno states that just before the
6   entry he started hearing a lot of banging, items being
7   broken upstairs, and flesh being struck.  (Moreno Depo.
8   32:19-22.)

9       In contrast, Alvarado states that there was no
10  altercation occurring in the residence at this time, nor
11  were there any sounds of screaming or crying.  (Alvarado
12  Depo. 49:16-50:14.)  Mr. Herrera provided similar
13  testimony. (Mr. Herrera Depo. 66:12-19.)

14      Ultimately, the undisputed facts show that Moreno
15  made the decision that five officers, Moreno, Prewett,
16  Lee, Aloyian, and Sontag, would enter the house.  (Moreno
17  Depo. 91:6-19.)

18
19      **4.   The Shooting**
20
21      Officer Prewett led the entry team into the house
22  from the doorway to the bottom of a set of zigzagging
23  stairs along the wall opposite the front door.  (SUF ¶
24  40; SGI ¶ 40.)  The stairs ascended for approximately
25  nine steps toward the left side of the house where there
26  was a flat landing along the left wall, and then the
27  stairs pivoted and ascended for another approximately
28

1    five steps toward the right side of the house where they

2    reached the second floor.  (Wysocky Decl., Exh. J.)

3         There are substantial disparities between Alvarado

4    and the officers' versions of the facts once the police

5    entered the home.  According to Alvarado's deposition[8],

6    it appears that Alvarado was out of view of the officers

7    when they entered because the officers told Perez that

8    they needed to see his wife and kid.  (Alvarado Depo.

9    81:12-15.)  At that point, she and her son approached the

10   landing where Perez was standing and saw that the

11   officers were standing at the bottom of the stairs.  (Id.

12   81:12-21.)  It appears that, according to Alvarado, Perez

13   was on the landing facing toward the police officers, and

14   she was on his left.  (Id. 40:23-41:5.)  Perez held the

15   gun in his right hand.  (Id. 41:6-10.)  While standing on

16   the landing, Alvarado told the police, "the pistol is a

17   toy."  (Id. 31:17-25.)  Alvarado testified that the

18   police said nothing after they asked to see her and her

19   son.  (Id. 82:17-21, 34:22-23.)  Perez then moved

20   Alvarado away from him with his left hand.  (Id. 41:11-

21   13.)  Then, Perez looked at the officers, and they

22   started to shoot him.  (Id. 41:18-21.)  At the time the

23   shots rang out, Alvarado states the gun was in Perez's

24

25        [8] Alvarado's testimony is unclear with respect to the
26   sequence of events leading up to the shooting and the
     spatial locations of the parties and decedent.  Despite
27   the lack of chronological clarity, it is clear to the
     Court that Alvarado's description of the incident differs
28   substantially from that of the officers.

1  right hand, and his "hand [/] arm was glued to his body"
2  on the right side.  (Id. 52:23-53:6.)

3     The officers present a contradictory version of the
4  events.  The officers state that they entered the home
5  and then positioned themselves at the bottom of the
6  stairs.  (Deposition of Tony Lee ("Lee Depo.") 94:4-17,
7  Wysocky Decl., Exh. K; Moreno Depo. 92:9-13.)  When they
8  entered, the officers could see the left side of Perez's
9  body as he stood on the landing.  (Deposition of Brandon
10 Sontag ("Sontag Depo.") 44:13-18, Wysocky Decl., Exh. L;
11 Prewett Depo. 59:15-28, Moreno Depo. 103:13-14.)  They
12 also could see a weapon in Perez' right hand.  (Lee Depo.
13 94:20-24, Sontag Depo. 43:20-25, Moreno Depo. 103:15-18.)
14 At least two of the officers had their guns aimed at
15 Perez when they entered.  (Sontag Depo. 45:10-14; Lee
16 Depo. 95:9-14.)  According to Lee, Prewett told Perez to
17 "drop the gun."[9]  (Lee Depo. 97:8-9.)  At this point in
18 the officers' version of the facts, Perez rotated his
19 torso in the officers' direction, opening himself up
20 toward the officers.  (Lee Depo. 97:10-18; Sontag Depo.
21 47:1-3, Prewett Depo. 58:18-59:10, Moreno Depo. 103:18-
22 23.)  Simultaneously, Perez raised his right arm in an
23 arc toward the direction of the officers with the gun in
24 his hand arriving at the level of Perez's waist.  (Lee
25 Depo. 98:9-11; Sontag Depo. 47:6-8; Prewett Depo. 60:5-
26

27     [9] It is undisputed that Rian Kennedy, the neighbor,
   heard an officer say "Put it down" twice.  (Kennedy Depo.
28 20:22-25.)

18; Moreno Depo. 104: 2-4.)  While Moreno states that the
gun was pointed at him (Moreno Depo 103:5-12), Lee and
Sontag testified that the gun was pointed in the
direction of fellow officers, but not directly at them.
(Lee Depo. 100:6-19; Sontag Depo. 47:9-10.)  At that
moment, the officers fired their weapons, with Sontag
firing two rounds (Sontag Depo. 50:1-2), Prewett shooting
ten (Prewett Depo. 60:19-24), and the other officers
firing an unknown number.  (Lee Depo. 100:4-5.)

    It is undisputed that according to dispatch records,
eleven seconds elapsed between the time the officers
entered the home to the time of Perez's shooting which
occurred at approximately 5:37am.  (SUF ¶ 52; SGI ¶ 52.)
Perez died as a result of the gunshot wounds.  (SUF ¶ 51;
SGI ¶ 51.)

    **5.  The Gun**

    Both parties admit that the object in Perez's right
hand was a toy gun.  (SUF ¶ 53; SGI ¶ 53.)  However, the
parties dispute the identity of the toy held by Perez at
the time of the incident.  Defendants provide photographs
of a fake gun retrieved during the investigation of the
incident.  (Wysocky Decl., Exhs. M1-4, N.)  The gun
pictured is black with a narrow tip.  (Id.)  Plaintiffs
state this is not the gun Perez was holding during the
shooting and describe the actual toy as light brown in

1  color without a narrow tip.  (Alvarado Depo. 22:22-24:4.)

2  Nevertheless, the parties agree that the toy gun held by

3  Perez on the date of the incident did not have an orange

4  tip on the end of it.  (SUF ¶ 43; SGI ¶ 43.)

5

6  **D.   Judgment as a Matter of Law**

7

8      **1.   Fourteenth Amendment Due Process**

9

10     Defendants seek summary judgment on a portion of

11  Plaintiffs' first cause of action under the Due Process

12  Clause of the Fourteenth Amendment pursuant to 42 U.S.C.

13  § 1983.  This claim asserts Plaintiffs' deprivation of

14  familial association in the loss of their father against

15  the individual officers only.

16     The Ninth Circuit recognizes that children have a

17  constitutionally protected liberty interest under the

18  Fourteenth Amendment in the "companionship and society"

19  of their father.  Curnow v. Ridgecrest Police, 952 F.2d

20  321, 325 (9th Cir. 1991).  Defendants do not challenge

21  the standing of Perez's two sons to sue for

22  constitutional injury under the Fourteenth Amendment for

23  loss of familial relations.

24     "Official conduct that 'shocks the conscience' in

25  depriving [a child] of that interest is cognizable as a

26  violation of [substantive] due process."  Wilkinson v.

27  Torres, 610 F.3d 546, 554 (9th Cir. 2010).  In

28

1   determining whether excessive force shocks the
2   conscience, the Court must first ask "whether the
3   circumstances are such that actual deliberation [by the
4   officer] is practical." <u>Porter v. Osborn</u>, 546 F.3d 1131,
5   1137 (9th Cir. 2008) (quotation omitted).  "Where actual
6   deliberation is practical, then an officer's 'deliberate
7   indifference' may suffice to shock the conscience.  On
8   the other hand, where a law enforcement officer makes a
9   snap judgment because of an escalating situation, his
10  conduct may only be found to shock the conscience if he
11  acts with a purpose to harm unrelated to legitimate law
12  enforcement objectives." <u>Wilkinson</u>, 610 F.3d at 554.[10]

13

14          **a.   Actual Deliberation**

15

16      In <u>Porter v. Osborn</u>, the Ninth Circuit found that
17  actual deliberation was not practical and applied the
18  purpose to harm standard where the police were faced with
19  an individual who, afer being pepper-sprayed, refused to
20  get out of the car but instead started to drive his car
21  at the officers.  546 F.3d at 1139-40.  The court held

22  ───────────────

23      [10] The parties misstate the standard applicable to
    Plaintiffs' Fourteenth Amendment due process claim.  The
24  parties fail to distinguish between the proper
    application of the purpose to harm and deliberate
25  indifference standards, and instead assume that the
    purpose to harm test applies to the facts presented by
26  this case.  (Motion at 7; Opp'n at 7-8.)  Therefore, the
    parties do not present any argument related to whether
27  actual deliberation was practicable under the
    circumstances or whether Defendants meet the lesser
28  deliberate indifference standard.

                            22

1  that actual deliberation was not practical because the
2  situation evolved quickly and the suspect's evasive
3  actions forced the officers to make repeated split-second
4  decisions.  Id. at 1139.
5      In Wilkinson, the Ninth Circuit also found that the
6  purpose to harm standard was appropriate where "[w]ithin
7  a matter of seconds, the situation evolved from a car
8  chase to a situation involving an accelerating vehicle in
9  dangerously close proximity to officers on foot," and the
10 suspect's "act of accelerating in reverse despite
11 repeated warnings to stop forced [the officer] to make a
12 split-second decision."  610 F.3d at 554.  The court
13 noted that the entire sequence of events "occurred in
14 less than nine seconds."  Id.
15     Viewing the facts in the light most favorable to
16 Plaintiffs, the Court cannot find as a matter of law that
17 actual deliberation was impossible.  Even though the
18 officers were only inside the home for eleven seconds,
19 the officers were at the scene for over 25 minutes and
20 remained at the threshold of Plaintiffs' door for at
21 least 10 minutes formulating a plan.  Thus, a jury could
22 reasonably find that the officers had time to deliberate
23 before shooting Perez.  Moreover, under Plaintiff's
24 version of the facts, the situation was not evolving
25 rapidly, in fact it was not evolving at all, as they
26 claim there was no altercation, screaming, or crying
27 occurring inside the house at any time while the officers
28

were present.  Similarly, according to Plaintiffs, Perez
was not involved in any evasive action because he was
standing still with his arms at his sides and was not
speaking at the time he was shot.  The most that could be
said is that Perez was under the influence of drugs and
failed to obey officer commands to come downstairs.  The
Court cannot find as a matter of law that these facts
qualify as a rapidly escalating situation requiring
split-second judgments.

Defendants argue that since they believed Perez was
holding a real gun, they subjectively thought they were
faced with a dangerous situation where they had to "act
decisively" and make decisions "in haste, under pressure,
and [] without the luxury of a second chance." County of
Sacramento v. Lewis, 523 U.S. 833, 853 (1998) (holding
that in the context of a high-speed chase, an officer
could not be liable for a due process violation without a
purpose to harm).  However, Plaintiffs' version of the
facts calls into question Defendants' subjective
understanding of the danger they faced.  Plaintiffs
present evidence to show that over the course of the 25
minutes they were on the scene, the officers were
repeatedly told by multiple family members and the
dispatcher that the gun was a toy and that Perez posed no
viable threat to the officers or others.  See McMurray v.
Cnty. of Sacramento, CIV S-09-2245 GEB, 2011 WL 4709876,
at *23 (E.D. Cal. Oct. 4, 2011) (finding a genuine issue

of material fact as to whether the situation was "tense
and dangerous" where according to plaintiff "there was no
arguing or yelling, and no confrontation between Damion
and the deputies" and "there was nothing in Damion's hand
other than a telephone and there was no reason to believe
that he was armed"); cf. Moreland v. Las Vegas Metro.
Police Dep't, 159 F.3d 365, 372 (9th Cir. 1998) (finding
deliberation inpracticable where "the gunfight in
progress threatened the lives of the 50 to 100 people who
were trapped in the parking lot").  Accepting Plaintiffs'
allegations as true, a reasonable jury could conclude
that the situation was not escalating at the time of the
shooting and that the officers had a sufficient
opportunity to deliberate on their course of conduct,
obviating the need to shoot Perez.

The Court finds that given the genuine disputes of
material fact, a reasonable jury could find that it was
practical for the officers to actually deliberate prior
to shooting Perez.  Under the test outlined by the Ninth
Circuit, if actual deliberation is practical, the Court
must examine whether the officers exhibited deliberate
indifference toward the decedent.  Wilkinson, 610 F.3d at
554.


### b.  Deliberate Indifference


Under the deliberate indifference standard,

1  Plaintiffs must demonstrate that the officers
2  "'consciously disregard[ed]' a substantial risk of
3  serious harm." See Farmer v. Brennan, 511 U.S. 825, 839
4  (1994) (citation omitted).  The officers cannot be liable
5  unless they were "aware of facts from which the inference
6  could be drawn that a substantial risk of serious harm
7  exists, and [they] must also draw the inference." See
8  id. at 837.
9     As discussed above, Plaintiffs put forward sufficient
10 facts from which a reasonably jury could infer that the
11 officers were aware that Perez faced a substantial risk
12 of serious harm.  They proffered evidence which
13 demonstrates that multiple family members and the 9-1-1
14 dispatcher told the officers that Perez's gun was fake.
15 Multiple officers admit to having heard these statements,
16 yet they ignored them when they formulated their plan of
17 entry and confronted Perez inside the home with guns
18 drawn.  A factfinder could conclude that a substantial
19 risk of serious harm would have been obvious when five
20 officers entered a home with their guns drawn and aimed
21 at an unarmed and intoxicated Perez who was located only
22 feet from the door.  Given that the officers nonetheless
23 proceeded with their course of conduct and fired a
24 minimum of fifteen rounds at Perez in close range, there
25 is sufficient evidence from which a jury could conclude
26 that the officers drew the inference that deadly harm was
27 highly probable under the circumstances and disregarded
28

that risk.  See Kosakoff v. City of San Diego,
08-CV-1819UEGNLS, 2010 WL 1759455, at *12 (S.D. Cal. Apr.
29, 2010) aff'd in part sub nom. Estate of Kosakoff ex
rel. Kosakoff v. City of San Diego, 460 F. App'x 652 (9th
Cir. 2011); Ingram v. City of San Bernardino, EDCV
05-925-VAPSGLX, 2007 WL 5030226, at *9 (C.D. Cal. May 3,
2007) ("Viewing the facts in the light most favorable to
Plaintiffs, an officer shooting an unarmed suspect who
was turning away could establish that Officer Green's
purpose in shooting Ingram was unrelated to the
legitimate object of arrest, and thus represents
conscious disregard for Plaintiffs' familial
relationship").

     Accordingly, a jury could conclude that the officers'
conduct "shocked the conscience," thereby violating
Plaintiffs' Fourteenth Amendment due process right to
familial association with their father.  The Court
therefore DENIES summary judgment on Plaintiffs'
Fourteenth Amendment claim under 42 U.S.C. § 1983.


     **2.  California Preshooting Negligence**


     A portion of Plaintiffs' third claim for relief is
based on the allegations that the officers used deficient
tactics leading up to Perez's death.  Defendants argue
that under California law, a negligence claim cannot be
premised on the negligence of police officers'

27

1    preshooting tactics.

2         Two California Courts of Appeals have found that a
3    duty of care cannot be imposed on police in the
4    preshooting context for the police's failure to prevent
5    harm.  See Munoz v. City of Union City, 120 Cal. App. 4th
6    1077 (2004); Adams v. City of Fremont, 68 Cal. App. 4th
7    243 (1998).  The Munoz court weighed the benefits and
8    drawbacks of imposing liability on officers with respect
9    to the tactical decisions they used in responding to a 9-
10   1-1 call and determined that the "need to protect the
11   overall safety of the community by encouraging law
12   enforcement officers to exercise their best judgment"
13   vastly outweighed the value of imposing tort liability.
14   Munoz, 68 Cal. App. 4th at 1097 (finding the officer's
15   "decisions as to how to deploy his officers at the scene"
16   and "the efforts made in an attempt to defuse the
17   situation as safely as possible" cannot subject the
18   officers to liability).  The court held, relying on
19   Adams, that "law enforcement officers are shielded from
20   ordinary negligence claims based on their response to
21   public safety emergencies when those efforts prove to be
22   ineffective in preventing . . . harm."  Id. at 1077.

23        Plaintiffs seek to impose liability on the officers
24   for allegedly negligent tactics including Moreno's call
25   for less-lethal force, but failure to wait for said means
26   to arrive before entering and Moreno's failure to use a
27   taser.  (Opp'n at 11-12.)  To support their imposition of

28

liability, Plaintiffs point to the Ninth Circuit's
decision in Hayes v. Cnty. of San Diego, 658 F.3d 867,
868 (9th Cir. 2011) where the court certified the
following question to the California Supreme Court:
"Whether under California negligence law, sheriff's
deputies owe a duty of care to a suicidal person when
preparing, approaching, and performing a welfare check on
him."  Id. at 868.  The court specifically noted that the
California Supreme Court has not decided "whether an
officer's lack of due care with respect to preshooting
tactical decisions can give rise to liability for
negligence," and found that there is a dispute over
whether the high court would follow the relevant
intermediate state appellate decisions in Munoz and
Adams.  Id. at 870.  The California Supreme Court has
not yet supplied an opinion on the issue.

     When "there is relevant precedent from the state's
intermediate appellate court, the federal court must
follow the state intermediate appellate court decision
unless the federal court finds convincing evidence that
the state's supreme court likely would not follow it."
Ryman v. Sears, Roebuck & Co., 505 F.3d 993, 994 (9th
Cir. 2007).  The Ninth Circuit's decision in Hayes
provides the Court with convincing evidence that the
California Supreme Court likely would not follow the
decisions in Munoz and Adams.  See Hayes, 658 F.3d at 872
(noting that the California Supreme Court's extended

analysis in <u>Hernandez v. City of Pomona</u>, 46 Cal.4th 501
(2009) of whether the officers' preshooting conduct
breached the relevant standard of care indicated that it
would likely not adopt the broad rule from <u>Adams</u> and
<u>Munoz</u> that officers owe no such duty).  Moreover, other
federal district courts have declined to follow <u>Munoz</u> and
<u>Adams</u> given the Ninth Circuit's decision to certify the
question to the California Supreme Court.  <u>See</u> <u>J.P. ex</u>
<u>rel. Balderas v. City of Porterville</u>, 801 F. Supp. 2d
965, 990 (E.D. Cal. 2011) ("In light of the <u>Hayes</u>
certification opinion, the Court will assume without
deciding that Hall and Dowling owed Prieto a duty to use
due care with respect to their pre-shooting tactics.").

     The Court declines to grant summary judgment as a
matter of law on Plaintiffs' preshooting negligence claim
given the lack of clear precedent foreclosing such
claims.  However, the Court does not reach the issue of
whether the officers were negligent with respect to their
preshooting tactical decisions, as the parties have not
presented arguments on whether the officers preshooting
actions were reasonable.  At this stage, the Court will
not foreclose Plaintiffs from seeking to impose liability
based on these actions, but the Court takes no position
as to whether the officers preshooting tactics were
reasonable.

     Accordingly, the Court DENIES Defendants' motion for
summary judgment on Plaintiffs' preshooting negligence

1  claim.

2

3                      **IV.  CONCLUSION**

4

5       For the foregoing reasons, the Court DENIES

6  Defendants' motion for partial summary judgment on

7  portions of Plaintiffs' first and third claims for

8  relief.  Due to Plaintiffs' withdrawal of the cause of

9  action, the Court also DISMISSES Plaintiffs' fourth cause

10 of action for violations of California Civil Code §§ 51,

11 51.7, 52, and 52.1.

12

13

14

15

Dated:  May 21, 2013

16                                Jesus G. Bernal
                             United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28